# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA
# RALEIGH DIVISION
# Civil Action No. 4:19-cv-121

CAMPUS SAFETY PRODUCTS, LLC,

    Plaintiff,

vs.

FIRE DOOR SOLUTIONS, LLC,

    Defendant.

**COMPLAINT**

Plaintiff, Campus Safety Products, LLC, complaining of Defendant, Fire Door Solutions, LLC, alleges and says as follows:

## INTRODUCTION

Under the guise of desiring to enter into a business relationship with the Plaintiff, Defendant, induced Plaintiff to enter into a Non-Disclosure Agreement so that the parties could exchange information for the sole purpose of exploring a mutually beneficial business relationship. Under this false pretense, Defendant purposefully, maliciously and systematically gathered Plaintiff's confidential, proprietary and trade secret information, not for the stated purpose, but rather for the purpose of unfairly competing with Plaintiff and co-opting Plaintiff's door barricade system as its own.

## THE PARTIES, JURISDICTION & VENUE

1. Campus Safety Products, LLC ("CSP"), is a North Carolina limited liability company.

2. Upon information and belief, Fire Door Solutions, LLC ("FDS"), is a Kansas limited liability company registered to do business in the State of North Carolina and is actively doing business in the State of North Carolina by virtue of its acquisition of Trinity Fire Partners, a company located in Wake Forest, North Carolina in late 2017. Upon information and belief, FDS has integrated Trinity Fire Partners into FDS such that FDS is engaged in substantial activity within the State of North Carolina.

3. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because CSP has claims for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(c). This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has pendent or supplemental jurisdiction over CSP's remaining claims pursuant to 28 U.S.C. § 1367.

4. This Court has personal jurisdiction over FDS because it has sufficient minimum contacts with the State of North Carolina to permit the exercise of personal jurisdiction consistent with the principles of due process.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because CSP resides in the States of North Carolina, and because FDS engages in substantial activity within this district.

**FACTUAL BACKGROUND**

**A. The Parties**

6. CSP specializes in providing protection for the safety of the general public and those who either visit, work, worship or study in public, private and government buildings.

7. CSP developed and designed RhinoWare® Door Barricade System ("RhinoWare") which is an emergency lockdown solution. The RhinoWare system locks down classrooms,

offices, and any other rooms where potential victims of gun or physical violence can seek to shelter in place. The RhinoWare system creates time enough for help to arrive and distance from those wishing to do harm. The simplicity and intuitiveness of its' design, combined with high force resistance, has made RhinoWare one of the most effective door barricade systems available. Ease of one-touch activation and deactivation provides a calm and subtle solution to otherwise traumatic events and provides reassurance to those using facilities so equipped.

**B.     CSP's and FDS's Contractual Relationship**

**January 2017**

8.      On or about January 30, 2017, CSP and FDS entered into a Non-disclosure Agreement ("NDA") so that the parties could "continue to explore a business opportunity of mutual interest." The NDA contemplated that the parties "may disclose or may have already disclosed to the other certain confidential technical and business information which the disclosing party desires the receiving party to treat as confidential." Further, the NDA provides that "[e]ach party agrees not to use any Confidential Information of the other party for any purpose except to evaluate and engage in discussions concerning a potential business relationship between the parties." Additionally, the NDA provides that "[n]either party shall reverse engineer, disassemble or decompile any prototypes, software or other tangible objects which embody the other party's Confidential Informaton and which are provided to the party hereunder."

9.      The NDA also provides that:

Confidential Information shall include without limitation the following, whether or not so designated upon disclosure: customer information, proprietary technical, financial, personnel, marketing, pricing, sales, marketing data, offer, and/or commercial information with respect to product or marketing programs including but not limited to; development, operation, performance, cost, know-how, content, business, process, manufacturing and marketing as well as ideas, concepts, designs and inventions, computer source and object code and computer programming

3

techniques; and all record bearing media containing or disclosing such information and techniques that are disclosed pursuant to this Agreement.

10. The parties were introduced to one another via telephone in January 2017 while CSP was in Louisville, KY for a breach/strength test of the RhinoWare System by the U.S. Army at Ft. Knox. CSP representatives were having conversations with dealers in Louisville about fire rated through bolts. CSP wanted the RhinoWare system to be compliant with fire door regulations, specifically NFPA 80. The dealer had found such a through bolt, with a distributor located in Stilwell, Kansas, Fire Door Solutions, LLC. At a point, FDS's CEO, Jeff Perry, became involved in the conversations about fire rated through bolts and expressed an interest in the RhinoWare system.

11. Initially, FDS expressed an interest in becoming a RhinoWare dealer. FDS invited representatives of RhinoWare to come to FDS's offices in Stillwell, KS, to discuss an "idea" they had that would result in a significant strategic partnership. The meeting was to occur on February 9, 2017.

12. Prior to the meeting, Ed Johnson, CEO of CSP ("Mr. Johnson"), requested that FDS sign a mutual NDA. FDS declined, however, to execute the NDA presented by CSP and insisted that CSP sign an NDA that FDS drafted, which it did.

**February 2017**

13. At the February 2017 meeting, CSP Board Member Kent Moore ("Mr. Moore") Mr. Johnson took a laptop with a PowerPoint overview of CSP and the RhinoWare system as well as a RhinoWare system demonstration unit with RhinoWare a Tactical Breach Tool. The Tactical Breach Tool allows law enforcement to disable the barricade system in the event of an emergency, such as an active shooter situation in a school, place of employment, or government building. Without a Tactical Breach Tool, the RhinoWare system is extremely difficult to

4

deactivate or disengage. At the end of the meeting, FDS requested that it be allowed to purchase the demonstration unit and Tactical Breach Tool, which CSP agreed.

14. During the meeting, Mr. Perry, indicated that FDS was interested in more than being a dealer for the RhinoWare system. Rather, FDS wanted to enter into a Licensing Agreement for a private labeled barricade device.

15. The Licensing Agreement was to apply to the RhinoWare system.

16. During the course of the meeting, CSP and FDS negotiated what were thought to be the material terms of the proposed Licensing Agreement. The proposed terms were negotiated by, among others, Mr. Moore, Mr. Johnson, Mr. Perry and FDS' President David Geenens ("Mr. Geenens") in February 2017.

17. The material terms of the proposed Licensing Agreement included the minimum number of RhinoWare units FDS would be required to purchase per year (100,000 per year for five years) for CSP to agree to a licensing agreement, and a minimum additional number of RhinoWare units FDS would be required to purchase in order to secure a right of first refusal should a third-party make an offer to acquire CSP.

18. The number of units to secure FDS's right of first refusal were 100,000 in year one(1), 200,000 in year two (2), 300,000 in year three (3), 400,000 in year four (4), and 500,000 in year five (5).

19. In essence, the right of first refusal provision between CSP and FDS was that if an unsolicited offer was presented to acquire CSP, FDS would have the right of first refusal to match the offer or veto the deal so long as FDS met the minimum annual purchase requirement.

5

20. Furthermore, the Licensing Agreement requirement was that FDS would achieve fire rating for the private label RhinoWare unit, with CSP agreeing to forego getting its RhinoWare system fire rated so long as FDS was meeting the minimum annual purchasing requirements.

21. In addition, all CSP dealers would be encouraged to sign with FDS for the licensed private label door barricade system, which would be fire rated.

22. The meeting was adjourned with what CSP thought was a mutual expectation that an agreement would be finalized in four to six weeks. For the next four weeks, Mr. Johnson continued the negotiations with FDS' President, Mr. Greenans. As part of the negotiation, and subject to the NDA, Mr. Johnson provided sales opportunities to FDS.

23. As the negotiations continued, FDS introduced additional conditions and contingencies, making the deal more complicated and slow to mature. One of the things that CSP agreed to do was to support FDS in the development of their Fire Door Armor (the name for the private label RhinoWare system) marketing materials and website content.

24. In late February 2017, Mr. Johnson sent to FDS two RhinoWare units with ½" holes in the plates for FDS' ½" through bolts *for the sole purpose of having them tested for UL fire rating certification* – all in keeping with the agreement as it was being negotiated and subject to the fully executed NDA.

25. CSP has since learned that FDS installed these RhinoWare units with RhinoWare branding removed and replaced with Fire Door Armor branding on a demonstration door in their offices for filming video demonstrations of the device being engaged for marketing purposes, with or without a licensing agreement.

26. In keeping with the negotiations as they stood, FDS was allegedly in discussions with UL to have the units fire rated. E-mail correspondence from FDS over the course of months

indicated that these discussions were ongoing. However, it became apparent that FDS was not going to be able to secure a fire rating for the units.

**March, April and May 2017**

27. Over the months leading into the summer of 2017, CSP continued to provide FDS with information as requested with the goal of finalizing the deal for a Licensing Agreement. In some cases, the information providedby CSP had taken years to compile and develop. CSP was not concerned, however, because it believed that it had the protection of the NDA.

28. FDS continued to assure CSP that the Licensing Agreement was imminent; however, FDS continued to make up excuses to draw out the process. In hindsight, it is apparent that FDS never intended to finalize a Licensing Agreement, but rather induced CSP to enter into the NDA so that FDS could steal its information and know-how, keep CSP on the sidelines, and market the Fire Door Armor system (actually the RhinoWare system rebranded as Fire Door Armor without prior authorization) to regulatory agencies and customers (including those that they became aware of through CSP).

29. In parallel to supposedly getting the agreement finalized, CSP was having FDS design a ½" through bolt that would have a Torx security (six lobe with dimple) slot. Upon information and belief, FDS delayed the development/prototyping of the through bolt in order to postpone the first rating test date for the RhinoWare system, thereby giving them more time to find a UL-certified test lab that would be agreeable to perform the test for FDS and its stolen product, Fire Door Armor. In other words, the longer the process dragged on, the more opportunity FDS had to acquire CSP's competitive information and develop its competing strategy using literally CSP's product under the guise of working toward a Licensing Agreement.

7

30. On or about May 1, 2017, Mr. Perry proposed a discussion regarding the acquisition of CSP by FDS. CSP entertained the idea and in response to a request from Mr. Perry, provided CSP corporate documents, cap tables, business plans, etc. CSP provided the documents with some level of comfort because of the prior executed NDA.

31. It became apparent, however, that this was just another delay tactic and a way to obtain CSP's sensitive corporate information that it intended to use to market the RhinoWare system as its own without ever paying license fees to CSP.

32. FDS requested, under the guise of easing the development of their Fire Door Armor device along with finalizing the proposed Licensing Agreement, that CSP provide its CAD drawings of the RhinoWare system. CSP did not provide these drawings.

33. By the end of May 2017, FDS completed its firedoorarmor.com website even though it had not finalized the Licensing Agreement. Upon information and belief, FDS never intended to finalize the License Agreement or to honor the NDA, but rather intended from the outset to stall CSP's marketing to the industry of its RhinoWare System and to co-opt as much of CSP's information and know-how as it could, all while gearing up to market to the world the RhinoWare product as its own under the name Fire Door Armor.

34. CSP was told that the firedoorarmor.com website would not be made public until the Licensing Agreement was finalized and executed. After all, what would FDS market since the product it was going to sell was a private label RhinoWare system?

**June, July and August 2017**

35. By June 2017, CSP expressed frustration with the continued delay of finalizing the Licensing Agreement and FDS, in response, proposed that it market Fire Door Armor without a

Licensing Agreement or purchase commitment. CSP refused this request, but continued to work to provide what FDS needed to get to the point of executing the License Agreement.

36. For example, CSP had its graphics person work with FDS's web/graphic's person to design the ACTIVE label with the Fire Door Armor logo. Once the design was complete, CSP sent the graphic to its printer to print a couple of samples. Without CSP's knowledge, FDS placed those labels on the units that they had installed on doors in their offices, so that they could demonstrate the units for marketing purposes.

37. In the first week of July 2017, Mr. Johnson reached out to Mr. Perry to again request a status update. As usual, to stall, FDS sent back an update on everything they were working on, but no substantive update on the License Agreement.

38. Due to the lack of progress on the License Agreement (and without knowing what FDS was planning), CSP began to pursue UL-certified fire rating testing for the RhinoWare System. CSP reached out to QAI Laboratories ("QAI") for testing. QAI agreed to test the unit.

39. However, a few days later, QAI contacted CSP and asked if CSP had any business relationship with FDS because they had seen a product that looked exactly like the RhinoWare system on the FDS website, offered as Fire Door Armor. QAI indicated that it would not test the CSP product if CSP was associated with FDS.

40. Upon inquiry, CSP learned that FDS posted CSP's RhinoWare unit on its website representing it publicly as FDS's own product, Fire Door Armor.

**September 2017**

41. On September 7, 2017, CSP called FDS and told them to immediately remove CSP's product from the FDS website. CSP also notified FDS that it would no longer pursue a business relationship with it.

9

42. FDS agreed to remove CSP's product from the website and CSP heard nothing more from FDS for the remainder of 2017.

**January 2018**

43. On January 4, 2018, CSP received an e-mail from FDS asking for an update on the RhinoWare fire rating certification. At that time, due to budget constraints, CSP had not moved forward with UL fire rating tests.

44. On January 5, 2018, CSP received a Purchase Order from FDS for 50 RhinoWare units and two Tactical Breach Tools. The Purchase Order referenced "RhinoWare private label barricade." CSP told FDS that it would only sell the product branded as RhinoWare and not Fire Door Armor. On that basis, CSP agreed to fill the order.

**February 2018**

45. CSP would not ship the order unless it was paid in full, and FDS did not pay in full until February 6, 2018.

46. On February 7, 2018, CSP received an e-mail from Mr. Geenens requesting an update on CSP's patent application status (since granted) for the RhinoWare system. The timing was curious and caused CSP to question the motivation.

47. On February 11, 2018, a press release was issued announcing a partnership between Singlewire Software and Fire Door Armor. The partnership is for the development of an electronic communication capability on the system to alert law enforcement and first responders of the fact that the system is in lockdown. This is yet another example of RhinoWare co-opted information that was subject to the NDA. It was during the negotiations of a deal between CSP and FDS that CSP shared its intention of seeking a patent for RhinoWare Connect – wherein a hardwired or wireless sensor would be integrated onto the device to alert backend monitoring or management

10

systems, law enforcement and first responders of a system or unit lockdown. CSP has since been awarded a patent on the RhinoWare Connect feature. A quick check of the Singlewire website showed a *RhinoWare* unit in the schematic. It was not even labeled Fire Door Armor.

48. On February 12, 2018, CSP decided it would not fulfill FDS' order and began doing online searches of Fire Door Armor.

49. CSP discovered that firedoorarmor.com was live and online. CSP transmitted a refund for the 50 RhinoWare units and this triggered an immediate request from Mr. Perry requesting a telephone conference to discuss FDS' funding from Emigrant Capital and the desire to move forward together.

50. On February 15, 2018, following the requested telephone conference, CSP received an e-mail from Mr. Perry with a proposed press release detailing the partnership between FDS and CSP. This proposed press release is identical to one that was released by FDS on February 26, 2018, the only difference being that all reference to CSP, RhinoWare or any partnership was removed and replaced with references to Fire Door Armor.

51. On February 23, 2018, an article was posted on the Kansas City Business Journal's website about Fire Door Armor and FDS. The photos posted in the article were the *RhinoWare* product. Several months after first publishing the article, Kansas City Business Journal replace the photos associated with the article depicting the rebranded RhinoWare device with photos of the FDS revers-engineered and slightly modified design of the Fire Door Armor device.

52. On February 26, 2018, KCTV aired a news story about FDS "inventing" a door barricade. The device shown, rebranded as Fire Door Armor, is one of the *RhinoWare* devices that CSP sent to FDS to be fire tested to obtain the UL fire rating. FDS also demonstrated the Tactical Breach Too, which CSP never allowed to be photographed or recorded on video. In fact, in order

11

to keep the design of the Tactical Breach Tool out of the public domain in order to better safeguard innocents and law enforcement, CSP elected not to even patent that design. Regardless, FDS demonstrated the device, without regard to the fact that doing so could endanger law enforcement and first responders, as well as those people the barricade system was intended to protect.

**December 2018**

53. In December 2018, CSP received UL-certified Fire Rating for RhinoWare. CSP received notification that its patent application for RhinoWare had been approved (patent number 10,214,948). CSP also received notification from the USPTO that a second patent will be awarded, covering Means of Notification/Communications (wired or wireless) for the Barricade.

54. Upon information and belief, FDS has tried to patent the Fire Door Armor and CSP's Tactical Breach Tool.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

55. The allegations of Paragraphs 1 through 55 of the Complaint are re-alleged and incorporated by reference as if fully set forth herein.

56. The NDA is a valid and enforceable contract.

57. By the terms of the NDA, "[e]ach party agrees not to use any Confidential Information of the other party for any purpose except to evaluate and engage in discussions concerning a potential business relationship between the parties."

58. FDS breached its obligations under the NDA by using CSP's Confidential Information for purposes beyond what it was contractually allowed. FDS breached its obligations under the NDA by using CSP's Confidential Information to compete against CSP all under the guise of exploring a business relationship that it never intended to consummate.

59. As a direct and proximate result of FDS's breaches of the NDA, CSP is entitled to recover from FDS damages, plus interest, to be shown and proven at trial.

## SECOND CAUSE OF ACTION
### (Fraud in the Inducement)

60. The allegations of Paragraphs 1 through 60 are re-alleged and incorporated by reference as if fully set forth herein.

61. FDS knowingly induced CSP to enter into the NDA with and obtain CSP's Confidential Information and know-how without any intent of legitimately pursing a business relationship between the parties, including the often-promised Licensing Agreement. FDS induced CSP to provide: (a) sales opportunities to FDS; (b) two RhinoWare units with ½" holes in the plates for their ½" through bolts – essentially RhinoWare prototypes for their stolen product Fire Door Armor; (c) Tactical Breach Tool; (d) marketing materials; and (e) other sensitive corporate information compiled and developed by CSP over a considerable duration of time, all while assuring CSP that it would enter into the Licensing Agreement, a bargained for agreement that CSP believed to be beneficial for both parties, without any intent of doing so, but rather with the intent of unfairly competing with CSP using, literally, CSP's RhinoWare System and passing it off as its own.

62. FDS did this with the intent to deceive CSP into providing the RhinoWare units and sensitive information for the purpose of marketing the Fire Door Armor system (actually the RhinoWare system) to regulatory agencies and customers (including those that they became aware of through CSP).

63. It is now apparent that FDS never intended to finalize a licensing deal, but rather, under the guise of negotiating a licensing agreement, FDS intended to deceive CSP.

13

64. FDS's actions did, in fact, deceive CSP, and CSP reasonably relied on FDS's false representations and assurances that it would enter into a mutually beneficial licensing agreement.

65. As a direct and proximate result of FDS's fraudulent inducement, CSP has suffered damages, plus interest, to be shown and proven at trial.

### THIRD CAUSE OF ACTION
### (Fraud)

66. The allegations of Paragraphs 1 through 66 are re-alleged and incorporated by reference as if fully set forth herein.

67. During the course of the relationship, FDS intentionally misrepresented its desire to enter into a licensing agreement with CSP.

68. FDS engaged in this conduct with the intent of deceiving CSP into providing FDS with: (a) sales opportunities to FDS; (b) two RhinoWare units with ½" holes in the plates for their ½" through bolts – essentially RhinoWare prototypes for their stolen product Fire Door Armor; (c) marketing materials; and (d) other sensitive corporate information compiled and developed by CSP over a considerable amount of time, all while assuring CSP that it would enter into the Licensing Agreement, a bargained for agreement that CSP believed to be beneficial for both parties, without any intent of doing so, but rather with the intent of unfairly competing with CSP using, literally, CSP's RhinoWare System and passing it off as its own.

69. FDS did this with the intent to deceive CSP into providing the RhinoWare units, the Tactical Breach Tool, and sensitive information for the purpose of marketing the Fire Door Armor system (actually the RhinoWare system) to regulatory agencies and customers (including those that they became aware of through CSP).

70. FDS's actions did, in fact, deceive CSP, and CSP reasonably relied on FDS's false representations and assurances that it would enter into a mutually beneficial licensing agreement

14

and only use its Confidential Information "to evaluate and engage in discussions concerning a potential business relationship …"

71. As a direct and proximate result of FDS's fraudulent inducement, CSP has suffered damages, plus interest, to be shown and proven at trial.

**FOURTH CAUSE OF ACTION**
**(Unfair and Deceptive Trade Practices)**

72. The allegations of Paragraphs 1 through 72 are re-alleged and incorporated by reference as if fully set forth herein.

73. FDS' conduct, as set forth above, including its misappropriation of CSP's trade secrets, constitutes unfair and/or deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 et seq.

74. Moreover, the willful missapproriation of CSP's trade secrets is more than a breach of contract and constitutes substantial aggravating circumstances. Further, the fact that FDS fraudulently induced CSP to enter into the NDA with no intention of performing or following the terms of the NDA when it was executed, and with no intention of pursuing a business relationship with CSP, constitutes substantial aggravating circumstances.

75. FDS' unfair and deceptive conduct affected commerce in North Carolina because, among other things, it caused injury to CSP in North Carolina.

76. FDS's wrongful conduct directly and proximately caused injury to CSP in excess of $75,000.00.

77. In addition, CSP is entitled to recover damages from FDS for its violation of the Act, with such amount to be trebled, as well as reasonable attorneys' fees, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Violation of the Defend Trade Secrets Act)

78. The allegations of Paragraphs 1 through 78 of the Complaint are re-alleged and incorporated by reference as if fully set forth herein.

79. CSP's Confidential Information, as defined in the NDA, and which was provided to FDS pursuant to the terms of the NDA, is information that is not made public and is available only to the CSP management team. CSP's Confidential Information constitutes trade secrets under the Defend Trade Secrets Act because they contain financial and business information that is maintained electronically on CSP's computer system, which is password protected. The Confidential Information is available only on a need-to-know basis.

80. CSP takes reasonable measures to keep the information secret, specifically by limiting the availability of the information to those with a need-to-know and by keeping the Confidential Information on password protected computers.

81. The Confidential Information derives independent economic value by not being known or readily ascertainable by proper means to competitors, like FDS.

82. CSP did not give permission to FDS to use the Confidential Information with anyone for any purpose "except to evaluate and engage in discussions concerning a potential business relationship between the two parties."

83. FDS acquired the Confidential Information while under the duty to comply with the NDA.

84. Upon information and belief, FDS acquired the CSP's Confidential Information for the purpose(s) of competing with CSP and giving FDS a head-start in competing against CSP, all the while distracting CSP with the false promise of a business arrangement.

16

85. As a result of FDS' misappropriation of the Confidential Information, CSP is suffering injury and harm to its reputation among its customers and may lose customers to FDS that it cannot recover. Without immediate and permanent injunctive relief, CSP will sustain irreparable harm for which there is no adequate remedy at law.

86. FDS willfully and maliciously misappropriated CSP's Confidential Information and other sensitive corporate information by using the information outside of the scope of its sole purpose – "except to evaluate and engage in discussions concerning a potential business relationship between the parties".

87. As a result of FDS' misappropriation of the Confidential Information, CSP has been and continues to be damaged and irreparably injured, including, but not limited, by the loss of sales and profits that it would have earned but for FDS' actions. In particular, CSP would be entitled to recover all profits earned by FDS on the sales of goods to customers in the Confidential Information, and any other damages, as may be determined at trial.

**SIXTH CAUSE OF ACTION**
**(Misappropriation of Trade Secrets)**

88. The allegations of Paragraphs 1 through 88 are re-alleged and incorporated by reference as if fully set forth herein.

89. CSP's marketing materials and other sensitive corporate information compiled and developed by CSP over a considerable duration of time are trade secrets within the meaning of the North Carolina Trade Secrets Protection Act, North Carolina Gen. Stat. §66-152, *et. seq*.

90. Others involved in the same industry do not know CSP's sensitive corporate information. The trade secret information derives independent commercial value from not being generally known in the industry.

91. CSP's trade secret information is not readily ascertainable through independent development or reverse engineering.

92. CSP takes reasonable measures to protect this information, including through provisions in the NDA, and by limiting it to those within CSP with a need-to-know basis and by storing on computers that are password protected.

93. FDS's conduct described herein constitutes unlawful misappropriation of CSP's trade secrets because it has acquired it under the guise of one purpose but is using and has used for improper competitive purposes.

94. The misappropriation of trade secrets by FDS has caused and/or will cause harm to CSP, the full extent of which is incapable of proof at this time.

95. As a result of FDS' willful misappropriation, CSP has suffered and/or will continue to suffer financial and economic loss, plus interest, to be shown and proven at trial. Further, CSP will suffer irreparable harm unless and until FDS is enjoined from using CSP's trade secret information. Accordingly, pursuant to N.C. Gen. Stat. § 66-154, CSP is entitled to preliminary and permanent injunctive relief, actual damages, measured by the economic loss suffered by CSP or the unjust enrichment caused by the misappropriation of CSP's trade secret information, whichever is greater, punitive damages, and reasonable attorneys' fees.

WHEREFORE, CSP respectfully prays that the Court:

(a) Issue a preliminary injunction during the pendency of this action prohibiting FDS from using, disclosing, or otherwise misappropriating CSP's trade secret information and other confidential information, pursuant to N.C. Gen. Stat. § 66-154(a) and the Defend Trade Secrets Act;

(b) Issue a permanent Injunction prohibiting FDS from using, disclosing, or otherwise misappropriating CSP's trade secret information and other confidential information, pursuant to N.C. Gen. Stat. § 66-154(a) and the Defend Trade Secrets Act;

(c) Issue an order requiring FDS to return to CSP any and all CSP products and materials in their possession, including any property containing CSP trade secret or any other confidential and proprietary information;

(d) Award CSP its actual damages, measured by the economic loss suffered by CSP or by the unjust enrichment caused by the misappropriation of CSP's trade secret information, whichever is greater, or by FDS' breach of the NDA, in an amount to be proven at trial;

(e) Award CSP treble damages, reasonable attorneys' fees and costs;

(f) Award CSP punitive damages;

(g) Award CSP its costs as permitted by law;

(h) Provide CSP with a trial by jury on all issues so triable; and

(i) For such other and further relief as is just and proper.

19

Case 4:19-cv-00121-FL   Document 1   Filed 08/28/19   Page 19 of 20

Respectfully submitted, this the 28th day of August, 2019.

        **NELSON MULLINS RILEY &**
        **SCARBOROUGH LLP**

        /s/ Fred M. Wood, Jr.
        Fred M. Wood, Jr.
         N.C. State Bar No. 18437
        Evan M. Sauda
         N.C. State Bar No. 32915
        Ariel E. Harris
         N.C. State Bar No. 46085
        301 South College Street, Suite 2300
        Charlotte, North Carolina 28202
        Telephone: (704) 417-3000
        Facsimile: (704) 384-2800
        E-Mail: fred.wood@nelsonmullins.com
                 evan.sauda@nelsonmullins.com
                 ariel.harris@nelsonmullins.com

        *Counsel for Plaintiff, Campus Safety Products, LLC*